AO 91 (Rev. 11/11) Criminal Complaint          AUSA Shawn McCarthy (312) 353-8881

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
NOV 20 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JORGE A. PEREZ

CASE NUMBER:

**18 CR 788**

## CRIMINAL COMPLAINT    MAGISTRATE JUDGE KIM

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 19, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

_____
RYAN PARKER
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: November 20, 2018

_____
Judge's signature

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, RYAN PARKER, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration, and have been so employed since July 2018. Formerly, I was a Task Force Officer with the Drug Enforcement Administration between approximately July 2015 and July 2018. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that Jorge A. Perez has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PEREZ with possession with intent to distribute a controlled substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, surveillance, review of audio-video recordings and transcripts, interviews of witnesses and cooperating sources and other evidence.

## FACTS IN SUPPORT OF PROBABLE CAUSE

4. On or about November 7, 2018, a cooperating source of information (CS-1)[1] told DEA agents that an individual known to CS-1 as "Niño"[2] receives shipments of approximately 20 kilograms of cocaine concealed within metal parts delivered to a shop near the intersection of Cicero Avenue and Division Street in Chicago, Illinois.

5. According to CS-1, s/he has purchased cocaine from PEREZ in the past and has had conversations with PEREZ during which PEREZ described receiving kilogram quantities of cocaine concealed in metal parts. According to CS-1, s/he had observed approximately 3 kilograms of cocaine inside PEREZ's residential garage as of approximately October 23, 2018.

6. According to CS-1, PEREZ uses phone number (312) 200-0728. On or about November 8, 2018, at approximately 1:31 p.m., CS-1 placed a consensually recorded and monitored phone call to (312) 200-0728 in which CS-1 and PEREZ

---

[1] CS-1 has been cooperating with DEA since approximately November 7, 2018. CS-1 has no criminal convictions and is unlawfully present in the United States. CS-1 is currently cooperating with the hope of not being deported due to his/her immigration status.

[2] CS-1 identified a known driver's license photograph of Jorge A. Perez ("PEREZ") as the person s/he knows as "Nino." In addition, as explained below, surveillance agents have observed the individual identified by CS-1 as "Nino" and identified him as Jorge A. PEREZ based on a comparison to a known driver's license photo of PEREZ.

2

discussed, using coded language, CS-1's recent encounter with law enforcement and the imminent arrival of the truck containing kilogram quantities of cocaine:[3]

> CS-1: What's up Nino?
>
> Nino: What's up?
>
> CS-1: you didn't call me?
>
> Nino: They told me that you got sick [had an encounter with law enforcement].
>
> CS-1: No, it's just gossip.
>
> Nino: How come?
>
> CS-1: They [law enforcement] stopped me because they were looking for my stepdad?
>
> Nino: Oh really?
>
> CS-1: Yes. He had problems in the past and he used to live with me.
>
> Nino: Oh ok, so you're ok?
>
> CS-1: Yea, I'm ok.
>
> Nino: Man, I was worried already.
>
> CS-1: Nah, I'm ok it's my step dad's problem, he's in Mexico. [Laughter]
>
> Nino: Did they tie you up? Did they handcuff you?

---

[3] All consensually recorded telephone conversations between CS-1 and PEREZ are in Spanish. A Spanish-speaking Task Force Officer has listened to the recordings of the calls and they are consistent with information provided by the CS. The recorded conversations summarized herein include my own and fellow agents' understanding of what was being said, including the use of coded language. This understanding and interpretation of the conversations is based on (i) the content and context of the conversations, (ii) my experience and my fellow agents' experiences as law enforcement officers, including our experience observing written conversations as a whole, (iii) the investigation to date; and (iv) the CS's interpretation of the conversation. The conversations described herein between CS-1 and various other individuals are draft summaries of Spanish-language communications and are not verbatim.

CS-1: No, no they didn't, because it wasn't for me. They only stopped me because I was on my way out of the house.

Nino: Oh so coming out of the house is when they stopped you.

CS-1: Yes. I don't have any problems.

Nino: We're ok then, we're good. Right now they are bringing up the horse [coded language referring to the truck containing kilograms of cocaine]?

CS-1: Oh really?

Nino: Yeah, they are bringing up the horse to take him to the beach. It leaves today, to land tomorrow and delivery on Monday. [The shipment of cocaine will cross the U.S.-Mexico border and arrive in Chicago for delivery on Monday, November 12.]

CS-1: Oh ok.

Nino: You still have a buck. I didn't call you because the phone died on me but I remember. I'm glad you're ok but do me a favor and call your brother to let him know you're ok.

Nino: Don't you worry, we are all in the same horse.

CS-1: Alright we are good then, there is not a problem.

Nino: I'm, extremely grateful that you are ok. [Nino is relieved the CS-1 was not arrested and did not have any issues with law enforcement.]

CS-1: Ok thank you. I'll talk to you later.

7. On or about November 7, 2018, CS-1 directed law enforcement to 4836 W. Division Street in Chicago (PEREZ Business) and identified the business, a metal processing facility called Victoria Metal Processor, as a location where PEREZ had previously received shipments of cocaine concealed within metal parts. According to CS-1, PEREZ had personally told him/her that he had received shipments of cocaine at this address.

8. CS-1 further directed law enforcement to 4024 W. Nelson Street in Chicago (PEREZ Residence) and identified the location as PEREZ's residence. CS-1 stated the detached garage of PEREZ Residence is the location where PEREZ would take the shipments of cocaine after they arrived at PEREZ Business. On or about November 14, 2018, law enforcement conducted surveillance of the area near PEREZ Residence. At approximately 10:25 a.m., law enforcement observed PEREZ inside the detached garage.

9. At approximately 11:26 a.m., law enforcement observed a black 2009 BMW park on the street a few houses west of PEREZ Residence. An unknown male driver exited and walked to the front gate of PEREZ Residence. The driver was carrying a white plastic shopping bag. Law enforcement observed PEREZ meet the driver of the BMW at the front gate of PEREZ Residence and engage in conversation. At approximately 11:34 a.m., the driver returned empty-handed to the black 2009 BMW and PEREZ walked towards the PEREZ Residence with the white plastic shopping bag previously carried by the driver of the 2009 BMW. At approximately 12:11 p.m., law enforcement observed PEREZ drive a grey 2004 Kia Spectra from the detached garage of PEREZ Residence. Law enforcement followed PEREZ to the area of 3047 N. Hamlin Avenue, where they temporarily lost sight of PEREZ. At approximately 12:25 p.m., law enforcement observed PEREZ walk from the area of 3047 N. Hamlin Avenue and return to his vehicle carrying a bag.

10. At approximately 12:30 p.m., surveillance units followed PEREZ to the grocery store located at 4000 W. Diversey Avenue in Chicago. Surveillance units

observed PEREZ park his vehicle, enter the grocery store and exit a few minutes later. At approximately 12:40 p.m. PEREZ returned to PEREZ Residence.

11. At approximately 12:53 p.m., law enforcement observed PEREZ leave through the front door of PEREZ Residence talking on his cell phone and walk westbound towards the intersection of Nelson Street and Karlov Avenue. Law enforcement further observed PEREZ meet with two men, (Individual A and Individual B) and later identified as Individual A and Individual B.[4]

12. Law enforcement observed PEREZ, Individual A and Individual B enter the PEREZ Residence at approximately 1:00 p.m.

13. At approximately 1:42 p.m., law enforcement observed PEREZ, Individual A and Individual B leave through the front door of PEREZ Residence and meet in front of the house with the driver of the black 2009 BMW who had met with PEREZ earlier that morning. Law enforcement observed Individual A, Individual B and the driver walk towards the street and out of sight. Moments later, law enforcement observed the black 2009 BMW depart the area heading eastbound on Nelson Street towards Pulaski Road with Individual A, Individual B and the unidentified driver inside. At approximately the same time, law enforcement observed PEREZ returning to PEREZ Residence.

14. Surveillance units followed the black 2009 BMW to a hotel located at 3210 N. Cicero Avenue in Chicago, where it parked on Cicero Avenue. At

---

[4] As explained below, Individual A and Individual B were identified based on identification found on their persons after being detained by law enforcement.

6

approximately 1:53 p.m., Individual A and Individual B got out the vehicle. Individual B was carrying a backpack and a large duffle bag as s/he and Individual A walked towards the entrance of the hotel.

15. Law enforcement approached Individual A and Individual B inside the elevator of the hotel. At that time, Individual A was carrying the duffle bag and Individual B had the backpack.

16. Law enforcement identified themselves as asked both Individual A and Individual B if they were carrying any contraband. Individual A responded that he was in possession of money. Law enforcement subsequently detained both Individual A and Individual B and transported them to the Chicago Police Department's 25th District Station. Individual A and Individual B were identified through identification carried on their persons.

17. Law enforcement recovered approximately $22,000 from the backpack and duffel bag recovered from Individual A and Individual B. The currency was subsequently presented to a trained narcotics detection canine and the canine alerted positive to the odor of narcotics on the currency.

18. While at the Chicago Police Department's 25th District Station, Individual A provided verbal and written consent to search two cell phones in his/her possession. Individual A also waived his/her Miranda rights and agreed to speak with law enforcement.

19. Law enforcement searched the browser history on one of the cell phones recovered from Individual A and saw a website link for Company A, a transportation

and supply chain management company based in Cookeville, Tennessee. The link was related to a shipment for an item weighing 260 pounds with assigned tracking number 0925388111 (the Subject Freight).

20. Law enforcement subsequently contacted Company A. An employee of Company A provided a bill of lading for tracking number 0925388111 (the Subject Freight), dated November 13, 2018. The bill of lading identified the shipper as Company B located in Houston, Texas, and the consignee as Victoria Metal Processor, 4836 W. Division, Chicago, IL (PEREZ Business).[5] The shipping unit was listed as "1 Hydraulic Piston (Ingersoll Rand) (Size/bore 10 in x 5 ft.) (ROD DIA 2 ½)" with a weight of 260 pounds and a capacity of 1600 PSI.

21. According to an employee of Company A, the $180 shipping fee for the Subject Freight was prepaid and the tracking information showed the Subject Freight departed Houston, Texas, on November 14, 2018; arrived in Memphis, Tennessee on November 15, 2018; and arrived in Burbank, Illinois, on November 16, 2018.

22. According to the bill of lading, the final destination of Subject Freight is the same address that CS-1 identified as the location where PEREZ receives cocaine – 4836 W. Division, Chicago, Illinois (PEREZ Business). In addition, the item identified in the bill of lading – a 260-pound hydraulic piston – was consistent with CS-1's statement that PEREZ and his associates use metal to conceal and transport shipments of cocaine.

---

[5] This is the same address as the business that CS-1 identified as being used by PEREZ for receiving shipments of narcotics.

8

### Recovery of approximately 23.15 kilograms of cocaine

23. Based on the above, agents obtained a Court-authorized search warrant for the Subject Freight on November 16, 2018. 18 M 753. Agents took custody of the Subject Freight at Company A's Burbank, Illinois, facility and transported the Subject Freight to the Village of Justice Public Works garage in Justice, Illinois, where agents searched the Subject Freight. The contents of the Subject Freight consisted of a metal hydraulic piston, but which was not in fact operational. Agents recovered approximately 20 wrapped bricks from inside the fake piston containing a white powdery substance that field-tested positive for the presence of cocaine. The bricks were weighed and the preliminary gross weight of the bricks was approximately 23.15 kilograms.

24. After recovering the approximately 23.15 kilograms of suspected cocaine, agents replaced the wrapped kilogram parcels with a sham substance and then repackaged the Subject Freight to give the appearance that it was not opened.

### Delivery of sham substance to PEREZ Residence

25. On November 19, 2018, agents obtained a Court-authorized tracking-device and trigger device warrant, 18 M 754, and a Court-authorized search warrant for PEREZ Residence, 18 M 756.

26. Law enforcement placed an electronic tracking device[6] and an optical detection device inside the Subject Freight.

---

[6] The transmitters emit an electronic signal that can be located by a receiver possessed by law enforcement. The transmitter and locating receiver can monitor whether the package

27. Law enforcement, acting in an undercover capacity, delivered the Subject Freight containing the tracking device to PEREZ Business.

28. At approximately 8:20 a.m., agents established physical surveillance of PEREZ Business. At approximately 8:36 a.m., surveillance observed gray Hummer[7] parked in the parking lot of PEREZ Business.

29. At approximately 12:22 p.m., law enforcement, acting in an undercover capacity, arrived at PEREZ Business with the Subject Freight.

30. At approximately 12:26 p.m., a forklift removed the Subject Freight from the undercover truck. At approximately 12:26 the forklift placed the Subject Freight in the bed of a red pickup truck[8].

31. Law enforcement, acting in an undercover capacity presented the bill of lading for Subject Freight. PEREZ accepted the freight and signed the bill of lading with the name "Pedro Vargas."

32. At approximately 12:39 p.m., the red pickup truck left PEREZ Business with the Subject Freight. Surveillance observed PEREZ as the sole occupant and driver of the red pickup truck.

---

has been opened but cannot transmit or record voice communication or acquire oral communication.

[7] According to a law enforcement database the gray Hummer is registered to PEREZ at PEREZ Business.

[8] According to a law enforcement database the red pickup truck is registered to the business located at PEREZ Business.

33. Surveillance followed PEREZ as he drove to the alley of PEREZ Residence and unloaded the Subject Freight into the detached garage of PEREZ Residence.

34. At approximately 1:02 p.m., surveillance observed PEREZ open the Subject Freight.

35. At approximately 1:03 p.m., law enforcement received an audible alarm that the censor had been activated. Law enforcement understood this to mean the Subject Freight had been opened.

36. Law enforcement entered the still open garage, placed PEREZ in custody and transported him to the 25th District Chicago Police Department.

11

37. After being advised of his Miranda Warnings, PEREZ stated he knew there were drugs inside of the Subject Freight, but said he didn't know how many there were. Law enforcement asked PEREZ if he knew what kind of drugs were inside the Subject Freight and PEREZ responded "coke.[9]" Law enforcement asked PEREZ how much cocaine was contained in the Subject Freight and PEREZ responded "it has to be something heavy" [based on my training and experience, I believe PEREZ referred to kilograms when he said "something heavy"]. PEREZ stated he was going to receive $2,000 for taking possession of the "pipe" (Subject Freight).

FURTHER AFFIANT SAYETH NOT.

_____
RYAN PARKER
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on November 20, 2018.

_____
YOUNG B. KIM
United States Magistrate Judge

---

[9] Law enforcement is aware "coke" is slang for cocaine.